## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JONAS DANILIAUSKAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:16-cv-9278 |
| v. | ) | |
| | ) | |
| RELIANCE STANDARD LIFE | ) | Hon. Charles R. Norgle |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Jonas Daniliauskas ("Plaintiff") brings his claim against Defendant Reliance Standard Life Insurance Company ("Defendant") pursuant to the Employee Retirement Income Security Act ("ERISA") seeking a judicial determination that he is due long-term disability benefits under the Group Long Term Disability Insurance Program ("Contract"). Before the Court are cross-motions for entry of judgment pursuant to Fed. R. Civ. P. 52. For the following reasons, Plaintiff's motion for judgment is denied and Defendant's motion for judgment is granted.

## BACKGROUND

Plaintiff, who suffers from a number of ailments,[1] is a former plan administrator with Alliance Pension Consultants, LLC. ("Alliance"), a subsidiary of Miller Cooper & Co. Ltd. As a Miller Cooper & Co. employee he was eligible for long and short-term disability through Defendant. On October 27, 2015, Plaintiff ceased working and was placed on short-term disability. On January 26, 2016, Plaintiff's long-term disability was scheduled to begin, but on February 19, 2016, Defendant denied Plaintiff's claim for long-term disability benefits.

---

[1] Plaintiff has: human immunodeficiency virus (HIV), prostate cancer; and mental deficits

Following the denial of benefits Plaintiff exercised his administrative remedies and on September 12, 2016, he received a letter upholding Defendant's initial determination.

## a. Findings of Fact[2]

The question before the Court is whether Plaintiff's ailments are sufficient to find that he is due long-term disability compensation under Contract's definition of disability. The Contract defines totally disabled as:

> "Totally Disabled" and "Total Disability" mean, that as a result of an injury or Sickness:
> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an insured cannot perform the material duties of his/her regular occupation...
> "(2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part – time basis or part of the material duties on a full – time basis."

Statement of Facts in Supp. Pl.'s Mot. for Entry of J. ¶ 5 [hereinafter, Plaintiff's SoF] (citing, Reliance Standard Life Insurance Company, Group Long Term Disability Insurance Non-Participating, p. 2.1).

In his application Plaintiff alleged that he was unable to perform his duties "due to HIV infection, prostate cancer, urinary incontinence, anxiety and depression, and cognitive impairments." Plaintiff's SoF, ¶ 6. In his motion, Plaintiff argues that all of his ailments contribute to his status as disabled.

Plaintiff is a pension administrator with Alliance. As a pension administrator Plaintiff must, *inter alia*, maintain client relationships; prepare accountings of trust accounts; determine contributions due; prepare management reports; and perform compliance testing. Administrative

---

[2] The Court takes the facts from the parties' Statements of Facts and relies on the Administrative Record (maintained by Defendant and heavily cited by Plaintiff) as well as other evidence presented by the Parties

Record, p. 105.  In order to successfully perform his duties Plaintiff must possess excellent verbal and written skills, strong problem solving and analytical skills, attention to detail, developed interpersonal skills, and self-motivation.  Id. at 105.

*1.      Plaintiff's HIV*

It is uncontested that Plaintiff is HIV Positive.  He has lived with HIV since 2005 and at present his HIV is controlled by a regimen of medication administered and overseen by his primary care physician, Dr. Robert T. Hargan.  Plaintiff is routinely examined by Dr. Hargan and the most recent records indicate that his HIV is managed by the new regimen of medication.  See Pl.'s Resp. to Statement of Facts in Supp. Def.'s Mot for Entry of J. and Add'l. Facts in Supp. of Pl.'s Mot for Entry of J., ¶ 20-22 [hereafter, "Pl.'s Resp. to SOF"]; see also Administrative Record, pp. 242, 244, 246, 248, 250, and 252.  In the records before the Court, Dr. Hargan indicates that Plaintiff's HIV is well managed and has not resulted in any secondary infections or complications.

Dr. Hargan does note, however, that beginning in late September 2015, Plaintiff began to experience some depression as related to his work.  Administrative Record, p. 248.  Dr. Hargan observes Plaintiff's depression through the most recent records before the Court, May 3, 2016. Id. at pp. 241-2.  These observations are undercut by recent observations that Plaintiff "has a normal mood and affect."  Id. at pp. 241, 243, and 245.

Accordingly, the Court finds that Dr. Hargan's care of Plaintiff is primarily related to his HIV diagnosis and other general issues.  As a result the Court places considerable weight in his determination that Plaintiff's HIV is well managed by his current medication.

## 2. Plaintiff's Prostate Cancer

Plaintiff was diagnosed with prostate cancer, "a low risk adenocarcinoma[.]" in 2014. Id. at 218-9. In mid-March 2015, Plaintiff was treated, without incident or abnormality, via CyberKnife by Dr. Dicker. The follow-up letters from Dr. Dicker indicate that Plaintiff recovered from his surgery without any significant issues. However, Plaintiff did suffer two episodes of incontinence in September 2015. Id. at 361.

The Court finds that Dr. Dicker is the physician treating Plaintiff's prostate cancer and as a result gives considerable weight to the evidence presented from his treatment. The Court also finds that Plaintiff's cancer has been treated and according to the evidence before the Court, he "continues to do well." Id. at 361.

## 3. Plaintiff's Myriad Mental Health Ailments

Plaintiff suffers from a number of mental defects and deficiencies. For several years Plaintiff has been treated by Jeff Levy, a *Licensed Clinical Social Worker*. Mr. Levy reports that Plaintiff has been dealing with depression and anxiety and from 2015 his depression, anxiety, and feelings of isolation have increased. Mr. Levy reports that, eventually, the combined stress of Plaintiff's HIV, prostate cancer, and professional responsibilities led to worsening depression and eventually disability. Administrative Record, pp. 150-151. Plaintiff remained highly anxious and continued to deal with issues relating to his depression and anxiety through Mr. Levy's reporting period. Id. at 443-444.

In addition to Mr. Levy, Plaintiff was treated by Richard Abrams, M.D., S.C. Before the Court are Dr. Abrams treatment notes for Plaintiff. They contain session notes wherein the Plaintiff's mental status is evaluated. In the notes Dr. Abrams acknowledges several instances of mental impairment as indicated by mistakes in a serial 7 test (counting backwards from 100 by

7s), some impaired concentration, anxiety, panic, and depression. However, in most of the notes from 2016 Dr. Abrams reports "no deficiencies in calculation, serial 7's, fund of knowledge, orientation, memory, ability to abstract, similarities, posture, grooming or dress." Id. at 355; see Id. at 352-356.

Lastly, Andrew Suth, Ph.D., examined and evaluated the Plaintiff's neurobehavioral and emotional functioning. Dr. Suth conducted a battery of test focused on Plaintiff's mental abilities and intellectual capacity. The "Global Cognition" tests indicate Plaintiff's IQ is average, his individual index scores were: verbal comprehension index, high average; perceptual reasoning index, average; working memory index, low average; processing speed index, average; full scale IQ, average. Administrative Record, p. 317. Dr. Suth's report states "[Plaintiff's] general abilities scores indicate robust intellectual capacity and premorbid functioning, testing revealed areas of specific weakness concentrated on frontal lobe functions." Id. at 317.

Dr. Suth's report goes on to discuss a number of different areas of cognitive functioning through the administration of a battery of cognitive tests. Discussed at length within his report are Plaintiff's memory, working memory, attention, and executive function. Dr. Suth made numerous conclusions, including: that Plaintiff suffers from cognitive challenges associated with attention and memory functions, Id. at 318-321; Plaintiff's learned memory is largely intact, albeit delayed, Id. at 323; and Plaintiff has difficulties with registering and learning new information, Id. Ultimately, Dr. Suth diagnosed Plaintiff, according to the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, with: Mild Neurocognitive Disorder due to an unspecified origin; Major Depressive Disorder, Recurrent, Moderate; Generalized Anxiety Disorder; Post Traumatic Stress Disorder. Id. at 325.

Accordingly, the Court finds that Plaintiff suffers from myriad neurological and psychological deficiencies. Plaintiff suffers from depression, anxiety, and panic disorders as well as neurological deficits associated with frontal lobe functions, *i.e.* memory and attention.

## ANALYSIS

### a.    Standard of Decision

"[Federal Rule of Civil Procedure] 52 allows this Court to conduct a trial on the papers and to resolve factual disputes[.]" Halley v. Aetna Life Ins. Co., 141 F. Supp. 3d 855, 857 (N.D. Ill. 2015). Unlike a motion for summary judgment the court can weigh the evidence presented, make conclusions, and resolve factual disputes. Fed. R. Civ. P. 52(a)(1). ERISA claims are "well-suited" to review pursuant to Rule 52. Fontaine v. Metro. Life Ins. Co., 800 F.3d 883, 885–86 (7th Cir. 2015).

Claims under ERISA are typically reviewed *de novo* by the district court. However, "the district courts are not reviewing anything; they are making an independent decision about the employee's entitlement to benefits." Diaz v. Prudential Ins. Co. of Am., 499 F.3d 640, 643 (7th Cir. 2007). "[W]hen de novo consideration is appropriate in an ERISA case… the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim." Id. at 643 (citing Patton v. MFS/Sun Life Financial Distributors, Inc., 480 F.3d 478, 485–86 (7th Cir.2007)). The party seeking enforcement of the plan bears the burden of proving his position under the contract by a preponderance of the evidence. Ruttenberg v. U.S. Life Ins. Co. in City of New York, a subsidiary of Am. Gen. Corp., 413 F.3d 652, 663 (7th Cir. 2005); see also Fontaine, 800 F.3d at 886.

Both parties acknowledge that a motion for judgment pursuant to Rule 52 is essentially a trial on the papers and given the substantive issue—ERISA—the Court will make an

independent decision as to Plaintiff's disability under the Contract. Yet, both Parties instead devote considerable time discussing the initial determination by Defendant and the subsequent appeal by Plaintiff. Because review of the initial determination is inappropriate given the motion before the Court, the Court ignores these arguments and makes an independent determination of Plaintiff's disability under the Contract.

**Plaintiff's Total Disability Claim**

Here, Plaintiff is asking the Court to find he is due disability benefits under the Contract. The total disability provision of the Contract is articulated as being unable to perform the material duties of, here, Plaintiff's regular occupation *or* "[a]ny occupation." Plaintiff's SoF ¶ 5 (citing Contract, 2.1). Any occupation is defined as one the Plaintiff's "education, training or experience will reasonably allow." Id.

Plaintiff, as articulated above, suffers from myriad ailments: HIV, prostate cancer, depression, and neurocognitive issues. As the Court found above Plaintiff is HIV positive, but his virus is well controlled through the administration of medication and is overseen by his internist, Dr. Hargan. Dr. Hargan's reports indicate that Plaintiff's HIV is well managed and Plaintiff admitted that his HIV is well managed and that there are no secondary infections or complications resulting from Plaintiff's HIV. Pl.'s Resp. to SoF at ¶¶ 20, 21. Plaintiff's prostate cancer is similarly well controlled. Plaintiff responded well to CyberKnife treatment save some side effects secondary to the treatment (urinary and fecal urgency and occasional incontinence). What remains is Plaintiff's mental defects.

While the Court considers the totality of Plaintiff's ailments in making a determination of disability, Plaintiff's mental health complaints are the major motivation for his disability claim. This statement is echoed by Plaintiff's primary care physician, Dr. Hargan, his Psychotherapist,

Mr. Levy, and Dr. Suth. Since 2015, Plaintiff's depression and anxiety have increased. Recent tests indicate that Plaintiff also suffers form decreased frontal lobe functioning resulting in decreased memory and attention.

These ailments, however, are not sufficient to prevail under the high bar set by the Contract. The Contract clearly sets out provisions wherein a claimant can receive disability as the result of mental or nervous disorders. Among the enumerated mental and nervous disorders are depressive and anxiety disorders, Pl.'s Resp. to SoF at ¶ 11, both of which affect Plaintiff. The standard set by the Contract is weather the claimant can perform *either* his own occupation *or* any other occupation commensurate with his skills and experiences.

In McFarland v. Gen. Am. Life Ins. Co., the Seventh Circuit interpreted the language of an occupational disability insurance policy with a definition of total disability similar to the definition contained in the Contract at issue here. 149 F.3d 583, 586 (7th Cir. 1998). The policy in McFarland defined total disability as when the insured is "unable to perform the material and substantial duties of [his or her] regular occupation." Id. The court held that the definition of total disability was unambiguous and that the insured would be totally disabled under the policy when he "cannot perform a sufficient number of his material and substantial duties and is therefore precluded from continuing the employment he undertook before the disability." Id. at 587.

Further, the court stated that "[t]he policy language could be interpreted reasonably to cover both qualitative and quantitative reductions in one's performance as a result of an injury or sickness." Id. at 588. A qualitative reduction would be one where the insured is "no longer able to perform one core and essential aspect of his job… as a result of an injury." Id. For instance, a shortstop, who could no longer perform the core and essential duty of throwing a baseball due to

his disability, but could still run, hit, and catch, would be totally disabled due to a qualitative reduction in his performance.  Id. In contrast, "a quantitative performance reduction would be one in which the injury or sickness would not physically prevent an employee from performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation." Id.

Here, the Contract would be limited to qualitative reductions in performance.  By virtue of the "any occupation" provision of the disability definition Defendant has limited Plaintiff's ability to claim disability where his overall reduction in performance would prohibit him from holding his original position where another similar, yet less demanding position, was available.

Plaintiff's duties, as articulated above, encompass a range of intellectual and inter-personal requirements and there is no dispute that Plaintiff has been effected by the litany of ailments he suffers.  However, Plaintiff's doctors have not identified any specific job requirements that he is unable to perform.  The evidence before the Court allows the Court to conclude that Plaintiff is suffering from some limitations to his problem solving, self-motivation, and analytical skills.  However, none of these skills are so impaired that he is unable to perform an essential element of his job.  See also Cheney v. Standard Ins. Co., 831 F.3d 445, 451 (7th Cir. 2016) (highlighting that "doubts or gaps" in the evidence should be resolved against the insured because they bear the burden of demonstrating policy coverage.)(citing Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005)).

Moreover, even if Plaintiff was to show that his disability reached the level that would preclude him from holding his original position; he would need to show that he is disabled from any other occupation commensurate with his skills and education.  While Plaintiff argues that he is not be able to handle the stress and mental demands of his occupation as a pension

9

administrator he may be suited to a number of other positions—Defendant analyzed Plaintiff's claim in light of his aptitude as a Benefits Clerk. Statement of Facts in Supp. Pl.'s Mot for Entry of J. ¶ 10.

**Plaintiff's Social Security Award**

In his reply, Plaintiff argues that the Social Security Administration's ("SSA") determination of disability is further reinforcement of Plaintiff's disability and urges the Court to consider its finding. He argues that because the SSA is a neutral and objective agency with more stringent criteria for evaluating disability, considerable weight should be given to its determination.

"An administrator is not forever bound by a Social Security determination of disability, but an administrator's failure to consider the determination in making its own benefit decisions suggests arbitrary decision making." Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 772–73 (7th Cir. 2010) (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 118 (2008)). While Defendant could not have considered the SSA's decision in its own decision making process— the SSA rendered its determination after the instant suit was filed—the Court does.

The SSA considers an applicant's: "age, education, and work experience, [and ability to] engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423 (d)(2)(A). The Agency's determination rests on the application of a medical vocational grid. In the SSA's determination Plaintiff was found to be moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods of time; and to complete a normal work day. Moreover, the agency determined that Plaintiff does not have transferable skills and that Plaintiff could only perform simple and

unskilled tasks. These findings are contrary to the weight of the evidence as laid out by the Court above.

**Remand to the Administrator**

Plaintiff asks the Court to award benefits and make a determination without remanding the matter to Defendant. The Seventh Circuit has stated that "[i]t would be a terribly unfair and inefficient use of judicial resources to continue remanding a case to the Committee to dig up new evidence until it found just the right support for its decision to deny an employee her benefits." Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 832 (7th Cir. 2004) (citing Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 302 n. 13 (5th Cir.1999) (en banc) (parties must make their full records before coming to the federal courts as "allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided.")).

Accordingly, the Court finds that Plaintiff has not satisfied his burden of proving disability by a preponderance of the evidence. Plaintiff is not disabled from his occupation as a pension administrator and is not due disability benefits under the Contract.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: March 14, 2018